## MISSOURI, K. & T. RY. CO. OF TEXAS v. PASSONS.

(Court of Civil Appeals of Texas. Dallas.
Feb. 8, 1913. Rehearing Denied
March 1, 1913.)

1. RAILROADS (§ 222*) — OPERATION — NUISANCE—EVIDENCE.

In an action by a householder, who lived adjacent to a railroad company's yard, evidence *held* sufficient to support a verdict that the operation of engines and cars was so careless as to be a nuisance.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 720–724; Dec. Dig. § 222.*]

2. RAILROADS (§ 222*) — OPERATION — INJURIES—DEFENSES.

In an action against a railroad company by a householder, who lived adjacent to its yards, for damage from smoke and noise, it appeared that when plaintiff first built there was only one track at that point, and the operation of trains thereon did not materially interfere with the occupation. Subsequently a large railroad yard was constructed and the number of engines greatly augmented, so that, with careless operation, they became a nuisance. *Held* that, if a structure, permanent in character, is a nuisance from which injury results to adjacent property, and the health of occupants is impaired or destroyed, the injured party may recover for any damage that is done, the fact that the house was constructed after the first track of the railroad was built does not estop plaintiff from claiming damages for subsequent injury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 720–724; Dec. Dig. § 222.*]

3. TRIAL (§ 252*)—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.

In an action by a householder for damages for the negligent operation of trains and engines, which depreciated the value of her property and destroyed its comfortable enjoyment because of the smoke and noise, where she testified that one of the engineers operated an engine so that it never made any unusual noise, and the railroad company offered no rebutting testimony, a requested charge that it had a legal right to operate its trains adjacent to plaintiff's premises, and that plaintiff could recover no damages for the consequences of those noises, sparks, and cinders which are ordinarily incident to the operation of locomotives, when operated by men of ordinary care, was properly refused, in view of the charge given, which required the jury to find that the engines were negligently operated, having no support in the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

Appeal from District Court, Hunt County; R. L. Porter, Judge.

Action by J. H. Passons against the Missouri, Kansas & Texas Railway Company of Texas. From a judgment for plaintiff, defendant appeals. Affirmed.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Alex. S. Coke, of Dallas, and Dinsmore, McMahan & Dinsmore, of Greenville, for appellant. B. Q. Evans, of Greenville, for appellee.

RAINEY, C. J. This is an appeal from a judgment rendered in favor of J. H. Passons against appellant railway company for $1,-000. There were other parties plaintiff, but a verdict was instructed against them, from which there is no appeal. For cause of action it was alleged, in substance, that the wife of J. H. Passons owned a house and lot in which they resided as their homestead, situated on Wellington street, in the city of Greenville; that appellant operated its road along said street through said city, and, beginning a short distance west of said premises, appellant maintains its yard, consisting of eight or nine tracks used for storing cars and making up trains; that from the station at Greenville out to said yards are several tracks which cross said Wellington street near plaintiff's said residence; that defendant operated a great many trains along said street day and night, which were carelessly handled, often blocking the street and obstructing the view, the engines unnecessarily blowing the whistles and letting off steam many times each day and night, often emitting cinders and sparks of fire, which fell upon plaintiff's home and in the cistern, causing the bedclothing to become blackened with smut; that the trains were often run at a great rate of speed, jarring the house and emitting great volumes of smoke, which entered the house; that the constant and unnecessary noises from the careless handling of trains, the blowing of whistles, and letting off steam, rendered the living in said house almost unbearable, decreased the value of the premises, and constituted a nuisance. "The defendant answered by general demurrers, special exceptions, and general denial, and also by a special plea that the plaintiff Passons or his wife had bought the lot on which they were residing, and upon it had built a home long after the railway had been located, and after trains were operated over the said railway, with full knowledge of the facts, and with full knowledge of the incidents and circumstances of operations of trains, and that for that reason plaintiff was estopped from claiming damages which flow from the location of the railway, or from the operation of trains over the said railway with ordinary care; also by plea of limitation of two years." A trial resulted in a verdict and judgment for appellee.

A peremptory instruction· was asked for by appellant on the ground of insufficiency of the evidence.

Only one witness testified on the trial of the case, and that was Mrs. J. H. Passons, the substance of which is: "I moved into this house back out there 8 years ago, and I have been living there ever since; and up until the time they commenced to put in the yards out there, 10 years ago, and when I bought my lot and built my house, 17 years ago, there was just the main line that ran from Greenville to Dallas, just one track that passed my house. They commenced to build the yards 9 or 10 years ago, and have been building on them ever since. They have not completed the yards out there yet, are still building on them. They put in a switch out there last year. * * * The track that was there at the time I built my house is there away over on the north side, and it is now the furthest track from my house, and that is the one they used at that time. There are four tracks, side by side, there now, and my estimate of the space occupied ·by them is 40 or 50 feet. There are 15 or 20 different engines that pass my house during the day and night. I don't know how many different engines pass it during a day and night; but I do know how many times my house will be passed by an engine during a day and night. This paper shows 97. I took on the paper the number of engines that pass from 7 o'clock in the morning until 7 o'clock in the evening. I suppose about the same number will pass between 7 at night and 7 in the morning. I can't tell any difference in night and day. Every few days I notice a different number of engine that I have not seen before. Commencing back seven years ago, and coming down to the present time, the first year I lived there there were not near as many engines passed· as now; nothing to compare. The increase has been gradual, every once in a while I see a different number of engine I never saw before. In the run of a day, engines will blow on Wellington street opposite my house 225 times during a day and night. They make such a shrill whistle it jars the house. Every window in the house shakes, and the house quivers and shakes and keeps me tore up all the time. It affects me with headache all the time, and keeps me so nervous and weak I can't hardly get about sometimes. I don't feel like I could get up and get a meal of victuals, because they blow the whistle and make such a roar and noise right against the house it jars me and the house, and keeps me so weak and trembling I feel like I could not get·up hardly. It jars my head and jars me all over. I have to slap my hands over my ears lots of times every day, and I am deaf and dizzy to go to turn round. I might near fall and have to catch to something to keep from falling. It makes me so dizzy when they sound those whistles from those engines on the main line. The main line is just 67 feet from the end of my. front porch to the first rail, and the others are just opposite of that. They also blow off steam and make roaring, jarring noises that jars you and deafens you—I don't know what you call it—but it makes some kind of awful roaring noise on top of the engine near the whistle. It seems the steam comes and jars you, and on the outside of the engine they push out

steam that jars you nearly to death, and sometimes I can't hardly stand it. Sometimes they will blow off steam 15 or 20 times a day, or maybe 50 times a day they will run up and do that way, and it jars the house. It is just the same at night; I can't tell any difference. This noise they blow off at the whistle, they will continue that as long as the engine is standing there. It is a roaring noise—jarring. When they are blowing the steam against the ground, they do not blow as long as this does on top, but they will blow maybe five or ten minutes up there. This business at the top of the engines I have seen them blow 15 minutes. They don't always blow the same length of time, but different lengths of time. They also have escape of steam on the side of the engine. I see that the steam shoots out on the side of the engine, and it comes right up to my door nearly. It is white smoke and looks like steam. I have seen seven engines congregate there on the street in front of my house at one time, then they will blow off that steam there and blow into the ground and up into the air. It makes me nervous, and keeps me with the headache nearly all the time; and there is hardly a day passes but what I have headache to some extent. Of course it is worse some days than others, and keeps me trembling. They commence this noise in the morning, and it continues until evening, and at the wind-up I feel so badly I had rather sit in a chair nearly than get up and go to bed. The engines throw fire, and my house is just covered with fire. When I would be out and an engine would come in, and I have laid anything on my bed, * * * it [meaning the fire from the engines] falls in front of me across the street; and last night I seen that house across the street covered with fire, and it put such a dread in my mind, because I don't know what minute my house is going to burn down on me. The whole elements are just like it is on fire sometimes when heavy loaded trains are coming in. I have seen balls of fire hit and roll away down to the third and fourth house below me. I have seen fire fall in the street and roll—great, big balls of fire— mighty near every time a train comes in. When the wind is from the north and northeast, it will throw the cinders on my house. I use all parts of my house; but I can't keep my windows open, because the trains keep everything smutted up, and old dirty steam or water blows into the windows and on my bedclothes and my bed and everything in the room. I have a cistern, and it is always full of cinders. They roll off the house into the cistern; and I have abandoned the cistern on that account up until about three years ago; we made out the best we could, and found out we had to quit using the water. It used to be a good cistern of water, and I used it all the time for cooking. The cinders and smut that is thrown on my house smuts everything up. I can't have lace curtains on my windows. I have to take them every week and wash them. My clothes are hanging in the wardrobe in the north room right now just as smutty as they can be. I could not tell yesterday morning whether my clothes were white or black. It was so dark yesterday morning, somebody opened the door and my house was so full of that old smut, and in a few minutes I couldn't tell whether my grandchildren were black or white. I could see the bulk of them. Those conditions also disturb me at night. Many and many a night I have laid down and tried to go to sleep but couldn't. The trains just worried me so I couldn't go to sleep. I have laid there lots of nights and couldn't bat my eyes to sleep. There is no street west of me that crosses this railroad. Going west on that street it is built up clear to Long Branch, which I guess is a half a mile. Houses are built on that street to the Cotton Belt Railroad; and there are five or six houses on the other side of the Cotton Belt Railroad. It is about 100 yards, I guess, from the crossing of Wellington street to the Cotton Belt street—to the crossing of Cotton Belt and Wellington street. Commencing at the north side, where the Katy Grocery Store and other businesses, the houses are thick and as close as they can well be. There is a whole lot of people living west of Wellington street and south of the railroad, down southeast of there. It is thickly settled. All have to come this street to get to town (meaning Wellington street). It is a public street, and goes to the Concord community and goes to Caddo Mills, and is a regular public road, and is used both day and night. There is not an hour during the day you can't look out and see from one to five wagons, buggies, and automobiles crossing that street. Several times a day black looking mud is thrown against my house, but I never noticed the exact times it has been thrown there; and it has been thrown on the house below me. When they would be blowing that old, black mud to the fifth house, they would be blowing off that old roaring noise, or steam, out there in the street. There has been a whole lot of increase of the blowing of the whistles since the time I moved back there. Commencing seven years ago, it wasn't near as bad when I was living there first as it is now, nothing to compare with it, because it is a whole lot worse now than it was then, because there wasn't near the trains, just one main line when we built there, and there has been a whole lot of increase in the number of engines and the worry and noise. Them old, big engines, 500 and 600, they make such awful roaring noises. They have increased their number of tracks and increased the size of the yard out there since seven years ago. If they would stop blowing the whistles opposite my house there on Wellington street, except at reasonable times (reasonable numbers of times a day), and if they would stop letting off the steam opposite my

house and go to some place else to do it, and if they would stop throwing the sparks, cinders, and things like I described, and if they would stop blockading the street, it wouldn't bother me half as bad—not near as bad as it does now. It is just such a constant thing now. If that was removed, I would not have any complaint to make. I don't own any other home; that is the only property I have. Taking into consideration the condition existing there now has changed from seven years ago and the present time, including the noise and the increasing of the yards out there, it decreases the value of my premises. If a train should pass along there just like trains do, and not blow on that crossing and not let off any steam, running at six miles an hour, it would be a rare thing, and I would notice it, and it would not affect me. Some of the engines that pass my house come through quiet and don't make any noise to amount to anything—enough to disturb anybody very bad—and again some comes through like lightning. I know some of the men who operate the switch engines—Lacy Webb, Falkner. Mr. Shook is an engineer, and he lives just across the railroad from me. He operates an engine there, and he comes in and out, and I never see or hear him make any unusual noise. It is just a common noise, and not enough to disturb anybody. He doesn't sound his whistle on that street. His residence is just up across the railroad from my house. If all those switch engines and other engines were operated like Mr. Shook's, I would not have a bit of complaint."

The evidence is sufficient to support the verdict and judgment, and the court did not err in submitting the cause to the jury for its determination.

[1, 2] When appellee first built on the lot, there was only one track built, and operations of trains thereon did not materially interfere with appellee's habitation of the house; but since then more tracks have been built, and the number of trains being operated has greatly increased, and which has augmented the noise, etc., rendering the discomforts and annoyances of occupying the house much greater and decreasing the value of the property materially. The evidence shows that the manner of handling and operating the engines and cars was carelessly done, and was of such a character as warranted the jury in finding it was a nuisance. Railway Co. v. Calkins, 79 S. W. 852; Daniels v. Railway Co., 96 Tex. 327, 72 S. W. 578.

In the Case of Daniels, last cited, Judge Brown, speaking for the court, said: "No case decided by this court justifies the conclusion that, if a structure, permanent in character, is a nuisance from which injury results to adjacent property, and by which nuisance the health of the occupants is impaired or the comfortable enjoyment of it is destroyed, the injured party is limited to compensation for the impairment of the value of the property. To the contrary, it is a rule of our law that full compensation may be awarded in one suit to the owner for all damages sustained from the same cause; and we see no reason why a party damaged in the value of his property, and in his health or the enjoyment of the property, should be denied the right to recover for either or both wrongs. The existence of a permanent nuisance may cause injury by destroying the comfort of a home, and not cause loss in the market value of the property, or it may cause injury to both; hence adequate compensation must embrace all the damage done, and no more."

[3] The court refused the following requested charge by appellant, which is complained of, viz.: "The defendant had a legal right to operate its trains drawn by locomotives propelled by steam over its tracks adjacent to plaintiff's premises; and the plaintiff has no right to recover damages from the defendant for the consequences of such noises, or sparks of fire, or smoke, or cinders, or steam, or water, as are naturally and ordinarily incident to the operation of locomotives over a railway, when such locomotives are operated in such manner as men of ordinary prudence and caution, under the circumstances, would operate them. If you believe from the evidence that defendant's locomotives and trains, operated over its road near plaintiff's premises, were run and operated as men of ordinary prudence and caution would operate them under similar circumstances, and if you believe from the evidence that only such noises were made by the defendant's locomotives, and such smoke and cinders and steam and water escaped therefrom, as are naturally and ordinarily incident to the operation of locomotives propelled by steam, then and in that event the plaintiff is not entitled to recover in this suit, and you will return a verdict for the defendant; and this is true, even if you believe that plaintiff or his wife suffered any of the injuries alleged in the petition as the result of the operation of defendant's locomotives and trains."

The proposition is submitted that, "upon a proper request, a defendant is entitled to have a direct and affirmative submission of a defense which is supported by the evidence, or which is necessarily raised by the evidence."

Appellee's cause of action was based upon the theory that the engines and trains of appellant were carelessly handled and operated; that the noises made by the whistles, the blowing of the steam, and the fast running, etc., were greater than necessary, and the court instructed the jury they must find the existence of such facts, and that they were the direct cause of plaintiff's injuries before finding for plaintiff; "but, unless you so believe, you will find for the defendant on this issue." The right of the railway company to operate its trains along its tracks

in a careful manner seems not to have been questioned in the trial of the case; but Mrs. Passons states that Mr. Shook, an engineer, "operates an engine there, and he comes in and out, and I never see or hear him make any unusual noise. It is just a common noise, and not enough to disturb anybody. He doesn't sound his whistle on that street. His residence is just up across the railroad from my house. If all those switch engines and other engines were operated like Mr. Shook's, I would not have a bit of complaint." The railway company introduced no testimony whatever nor any plea that the trains were operated in a prudent and careful manner. The evidence of Mrs. Passons was sufficient to show the noises were unnecessary, and the injury to herself and property could have been avoided; and, when the conduct of the trial, the evidence, and the charge of the court is considered, we think there was no error in the refusal of said charge.

All errors assigned have been considered; but we have found no error, and the judgment is affirmed.